This was an action of detinue brought by the appellant to recover the possession of a negro boy named Seac.
The defendant in the court below plead that the negro boy was free, and not a slave. Upon this plea, issue was joined, and a verdict and judgment was obtained by the appellee; to reverse which Edwards prosecuted this appeal.
It appears from a bill of exceptions, making a part of the record, that on the trial of the cause in the inferior court, the proof on both sides was as follows: "The plaintiff gave in evidence a bill of sale from one Turley, for the negro boy in question and his mother Clarissa; and proved the possession of the defendant, and a demand by the plaintiff before the commencement of the action. He also proved that the boy remained in his possession from the date of the bill of sale until the 19th day of November, 1809, and that he is of a deep yellow color.
The defendant gave in evidence the following instrument of writing, viz.: "I William Edwards do hereby relinquish all claim to a yellow boy named Seac, now in my possession, on the principle of his being free, and do hereby direct my wife Nancy Edwards: to deliver the said boy to Hinchey Pettway, or any other person by whom this writing may come. Given under my hand and seal this 19th day of May, 1808." To the admission of this piece of evidence, the plaintiff objected, but the objection was overruled by the Court.
The defendant also gave in evidence a record of the late Mero District Court, of a suit brought by Clarissa, the mother of Seac, against the plaintiff, for her freedom, which she obtained. *Page 306 
The counsel for the plaintiff then offered to prove that on the trial mentioned in the record a decree of the French Convention was given in evidence by Clarissa, which decree abolished slavery in the West India Islands. The witness when examined stated that on the trial an historical account of the decree had been read; and that a Mr. Jones was examined on the trial, who deposed that in 1795 he was in the Island of Guadaloupe, and that all persons there at that time were free; and further, that on the trial of Clarissa, a Mr. Yell had deposed that before the year 1794 he was in the Island; and that the greater part of the persons of her color were free. But there was no proof that Clarissa was ever on the Island, except what might be inferred from her speaking French; being a good seamstress; and having in her possession letters written by the captain of a trading vessel, whom she stated was her husband, dated about twenty years ago.
The court said that his testimony might be received, for the purpose of enabling the jury to ascertain at what time Clarissa's claim to freedom commenced, but for no other purpose.
The counsel for the defendant gave in evidence the decree dated the 25th day of March, 1794, from "Stephen's history of the wars, which grew out of the French Revolution,"
The plaintiff then gave in evidence a decree of the Consular Government of France, re-establishing slavery in the West India Islands, dated the 17th day of May, 1802, upon the same footing as it was in 1789.
Guadaloupe was captured by the English in 1793 and retaken by France in the year 1794, in the month of July and afterwards. At the date of the decree abolishing slavery, and the promulgation thereof in July, 1794, the Island was in the possession of the English.
The Court, in charging the jury, stated that the record of Clarissa's freedom was conclusive evidence to prove that her child, born after the period her freedom commenced, was free, although that were before *Page 307 
the commencement of the suit she brought against Edwards.
The counsel for the plaintiff requested the Court to instruct the jury that the decree of 1794 was nullified by that of 1802; and the Court said that it was, if practically those in any of the Islands emancipated by the former decree, had been reduced to slavery, otherwise not. The Court also instructed the jury that if Clarissa was made free by the decree of 1794, it took effect from the date thereof.
It was proved that the boy at the time of the present trial was about sixteen years old.
Haywood and Hayes, for the appellant. We object, first, to the admission of the record as evidence at all; but secondly, if it is evidence, that it ought not to be considered as conclusive in the point of view contemplated by the Circuit Court.
It can only be considered as a verdict which in no case is conclusive. Where a judgment can be given in evidence it will conclude the parties; but a verdict is only to be received as persuading evidence, — it is merely admissible. Swift's Evi. 9. But if we consider this as a judgment, it ought not to have been received as evidence, because of the want of privity. No one can claim a benefit from a judgment, unless, had it been otherwise determined, it would have operated to his injury; and so no person can be injured by a judgment which would not have benefited him, had it been differently adjudged. Suppose, in the suit between Clarissa and Edwards, she had failed to establish her right to freedom, when, by the laws of the land, she was indubitably entitled to it, ought such a judgment to be conclusive against Seac? It surely ought not. It seems to us that it would be most horrible to determine that a man's right to freedom should depend upon the mother's ineffectual attempt to establish that, which, by proper exertion, might have been easily ascertained. If, then, Seac would not have been bound by a verdict and judgment, finding his mother a slave, so neither shall he be benefited by a course of proceedings establishing her freedom. 1 Peake's Evi. 36-39; Cun. Law *Page 308 
Dic. title Privies. He can not be a privy in blood, because of the incapacity to inherit, being a slave. For the purpose of inquiring whether he can be considered in the light of a privy let us inquire whether he could prosecute a writ of error to reverse a judgment pronouncing his mother a slave? No person can prosecute a writ of error unless he be either a party or privy; if he be neither, he can not be affected by it. 5 Com. Dig. 686; 3 Com. Dig. 594. A stranger can not have a writ of error, but he must plead the matter of defence in avoidance, and then he is authorized to show that the judgment is unjust, and therefore not binding upon him. 2 Atk. 544; 2 Doug. 517. Besides, in this case, Sear can not be considered as a privy; because the mother is still living, and a writ of error can not be brought in the lifetime of the ancestor by a privy.
But admitting the rule which we have heretofore mentioned not to be reciprocal, how will the question then stand? We are apprised of a decision in Virginia, which concluded the claim of the child to freedom, upon the principle that it had been before determined the mother was a slave. It will occur at once that there is a marked and radical difference in point of reason, between the judgment finding slavery and one finding freedom. If the mother be found a slave, it is conclusive evidence that she never was free; because had she before been free she could not be a slave. But when she is found free, it does not prove she never had been a slave; because she might have been entitled to that freedom by manumission.
We have hither to considered this question upon the ground of the admissibility of the evidence. We will now consider it with respect to the effect which it ought to have if received. It is conclusive evidence, if it is at all admissible, to show the right of Clarissa to freedom, and also the right of such of her children as were born after the impetration of the original writ; because at that time the mother was free, otherwise she could not have supported the action. In those cases where the writ emanates after the birth of the child, the record can only be received as hear say evidence *Page 309 
to establish by reputation the right of the mother to freedom. 1 Hen. Mun. 387; 2 Hen. Mun. 193.
We conceive, also, that the Circuit Court erred in admitting as evidence the release executed by Edwards. The acts of Assembly of this State have pointed out the mode by which a slave may be made free, which is totally unlike this release; it, therefore, can not be considered as a manumission. Nor can it avail the appellee in any other light; because this release is not made to any body. He can not be divested of his right, unless some other person be invested.
As to the force of the French decree of 1794, abolishing slavery in the Islands, if we go by principles of our own Constitution, it was an act which the French Convention had no right to perform, because it was a violation of private property. Upon this decree must the whole reliance of Clarissa be placed. She can not pretend that she was born free; the introduction of the decree to establish her emancipation, proves that matter beyond controversy. It seems to us further, that the decree must be considered as inoperative; because, both at the time of its date and promulgation, that portion of territory upon which it was intended to operate, did not then belong to France. It was in the possession of Great Britain by the right of conquest, and as such, could be subject only to the laws of the captor. But waiving any objection of this sort, and still the same effect will be produced, because of the consular decree of 1802. The government of France possessed the unquestionable right of placing things in statu quo. The object was to abrogate the emancipating decree of 1794, and to undo that which had been before done. The recurrence back to 1789 shows that the object was to reduce those to slavery who had been before emancipated.
Cooke and Whiteside, for the appellee. We do not contend that the record ought to be received as conclusive evidence of Seac's right to freedom. It is conclusive as to Clarissa in every possible point of *Page 310 
view; but it may be opened in a controversy with Seac, so far as to ascertain at what time the mother's right to freedom accrued. If that was before the birth of the child, it is then conclusive as to him. It is not at all material what may be the opinion of the jury who tried his cause, with respect to the freedom of his mother. The only thing they had to do was to examine the testimony delivered on the trial of her cause, with the sole view to ascertain at what time her claim to freedom commenced. Whether well or ill founded, can not be in any manner essential. It would be an abominable idea to suppose that every descendant of a mother whose right to freedom has been already established shall be compelled, whenever any person chooses violently to set up a claim to them, to go into a full investigation of the claim to freedom on the part of the ancestor, because it is obvious that the evidence going to prove it, would be in most cases, entirely beyond the control of the descendants, and out of their power to produce.
A privy is defined by the English law to be one whose right to the thing in question may be benefited or injured, according as the matter in controversy may happen to be determined. It is laid down expressly by the Court of Appeals in Virginia, 2 Wash. 64, that a judgment finding the mother to be a slave, is conclusive as to the child; and proceeding upon the principles of reciprocity assumed by the gentlemen on the other side, which are undoubtedly correct the converse of the proposition would seem necessarily to follow. Indeed, in Virginia the case was determined upon the ground of privity between the mother and child. We need expect no direct authority in the British books on this subject, because the kind of property which is now in contest does not exist in that country.
By the laws of this country the condition of a child, as it regards freedom or slavery, depends upon the situation of the mother at the time of its birth. The descendant must, therefore, be considered in the light of a privy in personal rights. What is considered *Page 311 
a privy? It is that person whose right to a thing is dependent on, and associated with the right of another. When a person inherits a tract of land, for instance, from some other person, he is considered as a privy to that person, and will be bound by any judgment affecting the thing inherited. The magnitude of the inheritance in this case can not alter the situation of the child in its relations to the mother. The inheritance of liberty or slavery, which necessarily follows the condition of the mother, makes the child as much a privy as if the thing which descends to it were property only. The condition of the mother determines the rights and privileges of the child; therefore, if the mother be free, the child is free also.
Besides, he is privy in blood, as being the son of his mother. It is objected, however, that he can not be privy in blood, inasmuch as he can not inherit, he being a slave. If she were a slave would he not inherit that condition? And it may be remarked also, that the gentlemen on the other side, for the purpose of supporting their position, assume the fact of slavery, which is the very matter in issue, and argue from it, as if it were admitted. In addition to this, Edwards is a party to both suits.
The decree of the national convention took effect from the time of its date or promulgation and it is not material to us which; for in either case, the event happened before the birth of Seac. That Great Britain had possession of Guadaloupe, by the right of conquest, can not alter the question. The two nations were then at war with each other; Great Britain was in the actual occupancy of Guadaloupe, a French province; France, with a view to a recapture, issued a proclamation giving freedom to the slaves in the province, and inviting them to join the French standard and aid them in expelling the enemy. It is notorious, as an historical event, that the successes of France under Victor Hughes in the West India islands, are wholly to be attributed to the decree of emancipation. France, in her original conventional capacity, had the right to pass this decree, although it does *Page 312 
affect private property. A similar right attaches to the people of every country in their conventional capacity.
It remains to be considered how far the decree of 1802 abrogates that of 1794. We contend that it did not mean to reduce those to slavery who before were free; but only to tolerate slavery thereafter in that island. If it goes further than this, it is very questionable how far it can affect persons subject to the former decree. We utterly condemn the idea that any nation has the right to make a slave of a free man without his own consent. Freedom when once acquired, is a privilege of which no man can be divested, unless by the strong arm of power. The Circuit Court in this point of view, were correct in saying that the decree of 1802 did not abrogate that of 1794, unless those emancipated by the latter decree had been practically reduced to slavery. It would be folly to suppose that the inhabitants of St. Domingo are subject to the decree of 1802. Reducing those unfortunate people again to a state of servitude, must depend solely upon the power of the sword; and there can not be a possibility that a court in a country like ours, can be found corrupt enough to lend the arm of the law to assist mere acts of power in a foreign government to deprive a human being of his liberty. And here too it may be also observed that Clarissa claims her freedom from her birth. It is no objection to this claim, that she attempted to fortify it by additional grounds.
But it is contended that the decree of 1802 was carried into effect in Guadaloupe. Be it so; and yet it could not affect Clarissa unless she was in the island at the time. The record does not show whether she was or not; but it is fair to presume in favor of liberty, unless the contrary is proved, that she had left there before 1802.
We did not offer, nor was it so received by the Court, the release executed by Edwards as evidence of Seac's emancipation; but to prove one of two things, — either an admission or confession on his part that the boy was already free, which it was surely *Page 313 
competent for us to prove; or, as evidence that he had divested himself of his right to that person from whom the consideration of the release moved. That was Clarissa; she had a claim against Edwards for her hire during the time he had kept her in bondage; and her discharge of that was the reason why be executed the release.
On the first impression the Court entertained no doubt of the correctness of the opinion of the circuit judge in relation to the record, because we conceived that the jury could not be misled by it, as the main point of the charge was correct, viz., that a child born after the mother's freedom commenced was free.
But on further argument and more minute attention to the subject, it occurs that the incorrectness of the charge had a manifest tendency to mislead the jury, and therefore the error must be corrected.
To make a record conclusive evidence in any case it must have been between the same parties or their privies on some point coming directly in issue by the pleadings, and not to be collected by any inference or otherwise shown. Hence, it would seem it must specially be relied on as an estoppel agreeably to the case in 3 East, 364, 365, 366. Now, it is evident that the time when Clarissa's freedom commenced does not appear from the record, and consequently it is no evidence of that fact, neitherprima facie nor conclusive. It was evidence that the mother was free at the time the writ in that suit issued; but as to the time of the commencement of that freedom the record is silent, and therefore bore no relation to the freedom of a child born previously. This observation, however, will also be understood in relation to the evidence in that case as disclosed by Mr. Hayes, that Clarissa, the mother, was not born free, but emancipated.
If the jury had taken the trouble of looking into the record and thinking for themselves, it would readily have occurred that the judge was mistaken in supposing that the record had any relation to the *Page 314 
points of the charge. But we are not to presume they did examine the record; it was their duty to confide in what the judge stated as to the points of law. The jury might well understand that the record was conclusive as to any inquiry respecting the freedom of the boy. Whether the boy was free or not was completely open to proof, it having been shown that he was born previous to the emanation of the writ in the suit of the mother against the present plaintiff. Nay, the question whether the mother was free was open to investigation by the jury, coming as that question did into view collaterally and not by a special plea. But in all such cases courts would consider that of great weight, and unusually strong evidence would be required to overthrow the verdict of another jury. In the nature of things every jury would consider it in the same light. The first investigation being on oath on a point coming directly in issue, and consequently the parties completely prepared deserves the highest respect when coming collaterally into view in another suit, and more especially when such investigation is nearer in point of time to the date of the transaction giving rise to the first verdict and judgment. Of so high a nature in point of credit is such a verdict, that many writers of respectable jurisprudence have treated of it as conclusive; and so the judges of the State of Virginia seem to have construed it in some of the cases referred to at the bar. See 2 Wash. 64; 1 Hen. Mun. 55, 193, 203. In this reasoning, the Court desires to be understood when speaking of a verdict being conclusive, that it must be so in point of law, which it can not be unless relied upon in pleading. In point of fact it comes before a jury, and they surely ought to consider themselves bound by it unless they clearly and beyond all doubt are convinced it was erroneous. Suppose the boy was born after the issuance of the writ in the first suit, he might have pleaded that matter and relied on the verdict in the case of the mother as an estoppel, and the facts appearing that the plaintiff was a party to the former suit he would have been barred; in which case the Court would consider *Page 315 
the son as privy in blood, and Edwards, the plaintiff in the former soil, would be estopped from replying fraud or collusion as might be the case if he had not been a party. And on the same ground he can not give in evidence fraud and collusion in his suit with the mother. And further, he having been a party to the former suit, though the Court can not say the verdict is conclusive in point of law, it is difficult to conceive a case but that it would be conclusive in point of fact. Perhaps nothing less than proof that would remove the smallest particle of doubt would be sufficient to authorize a jury to find contrary to such a verdict. In reason and justice there is the same ground that the jury should consider it as conclusive as that the Court should when referred to them by special pleading. But it being a point of fact, the Court can not constitutionally say that one jury shall be bound in all imaginable circumstances by the finding of another. In other respects the Circuit Court was correct. But the judgment must be reversed.